# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | |
|---|---|
| **TONY ANDERS,** ) | |
| ) | |
| Plaintiff, ) | Case No. 7:21CV00030 |
| ) | |
| v. ) | **OPINION AND ORDER** |
| ) | |
| **SUPERINTENDANT BOBBY** ) | JUDGE JAMES P. JONES |
| **RUSSELL, ET AL.,** ) | |
| ) | |
| Defendants. ) | |

*Tony Anders, Pro Se Plaintiff; Christopher S. Dadak, GUYNN, WADDELL, CARROLL & LOCKABY, P.C., Roanoke, Virginia, for Defendants Bobby Russell, Scott Booher, Christopher Hayes, Chad Keller, and William Maddy; Angela Boice Axselle, WIMBISH GENTILE MCCRAY & ROEBER PLLC, Richmond, Virginia, for Defendants Wellpath, LLC and David MacDonald, DO.*

The plaintiff, Tony Anders, a Virginia inmate proceeding pro se, filed a Complaint under 42 U.S.C. § 1983, alleging that at the Western Virginia Regional Jail ("WVRJ"), the defendants responded inappropriately to protect him from, and treat him for, the COVID-19 virus.[1]  After review of the record, I conclude that the defendants' Motions to Dismiss must be granted.

---

[1]  Anders names the following WVRJ officials or contractors as defendants: Superintendent Bobby Russell, Major Hayes, Captain Keller, Captain Booher, and Officer Maddy ("the nonmedical defendants"); and Wellpath, LLC ("Wellpath") and Dr. MacDonald, Medical Director ("the medical defendants").  Wellpath is a healthcare services company that provides medical and mental health care to those in custody in jails and prisons.

## I.    BACKGROUND.

After Anders received a Virginia prison sentence in March of 2019, he was confined for some time at WVRJ.[2]  He alleges that in late September or early October 2020, WVRJ administrators allegedly decided to "rent bed space to a number of COVID-19 Positive inmates from the Franklin County Jail."  Compl. 3, ECF No. 1. When the Franklin County inmates arrived, other WVRJ inmates allegedly had to triple bunk or sleep on the floor.  *Id.* at 7.

Anders also complains that WVRJ administrators did not keep the Franklin County inmates housed together.  He submits a Franklin County inmate's affidavit stating even after that inmate told officials he was feeling sick and believed his negative test results were wrong, officials still placed him in the WVRJ general population until he later tested positive for COVID-19.

According to Anders, within a week, inmates and staff at the jail were getting sick.  Staff set up quarantine units for COVID-19-positive inmates, but Anders alleges that inmates were "still moved and shuffled in and out of different units, mixing positive and negative testing inmates together."  *Id.* at 4.  Anders asserts that

---

[2]  In addition to the Complaint, Anders filed a motion seeking interlocutory and declaratory relief.  I denied the motion as moot because Anders had been transferred to a different jail facility.  Thereafter, Anders filed a memorandum and affidavits from other WVRJ inmates, purportedly offering additional facts in support of that motion.  Although Anders did not move to add this material to his Complaint, I will consider it in addressing the pending motions.

in many unspecified instances, officials allowed positive and negative inmates to share tablets, telephones, library books, and newspapers that were not cleaned between uses. He also asserts that cells were not cleaned between inmate occupants during this period.

Anders allegedly complained to Superintendent Russell and Major Hayes in early November 2020, asserting that these practices put WVRJ inmates' lives at risk. When he received no immediate response, Anders complained to Captain Keller that he did not feel safe because a lot of people at WVRJ were getting sick. He asked to be transferred. Keller told him to "stop complaining" because he would "eventually" be sent to prison. *Id.* at 3.

On November 11, 2020, defendant Maddy allegedly left open a secure sliding door between E-1 and E-4 units, allowing inmates from those units to congregate, shake hands, and hug each other. Later that night, Anders asked Maddy to let him see the nurse, but the officer told him "to sign up for sick call." *Id.* at 4.

On November 12, 2020, all inmates in E-4 unit were tested for COVID-19, including Anders. More than half of the inmates tested positive for COVID-19. Anders tested negative. The next day, defendants Keller and Booker and other officers, all wearing personal protective equipment, began moving all E-4 inmates who had tested negative into a different housing unit. Anders told Keller that he was

not feeling well.  Keller allegedly said that because of Anders's negative test result, he would move into E-2 unit with others who had tested negative.

After that move, Anders allegedly became so sick that he was "nearly bed-ridden, coughing, vomiting, and suffering breathing difficulties." *Id.* at 5.  He asserts that Wellpath and Dr. MacDonald had "adopted a practice of treating all COVID-19 medical request[s] as routine," rarely responding to written requests about COVID-19 and requiring inmates "to wait until the nurse[s] made their regular sick call rounds." *Id.* at 6.  Anders alleges that after he had complained for days of feeling sick, medical staff examined him, but provided only Tylenol to treat his COVID-19-like symptoms.

On November 20, 2020, staff provided Anders with another COVID-19 test that showed a positive result.  At that point, officers moved Anders back to E-4 unit with other inmates who had tested positive.  Anders claims, however, that Wellpath and its unspecified employees "falsified some test results and or did not conduct all the test[s] they said they performed on inmates." *Id.*

Liberally construed, the Complaint asserts the following claims: (1) the nonmedical defendants were deliberately indifferent to serious risks to health and safety, in violation of Anders's constitutional rights, when they (a) allowed COVID-19-positive inmates from another jail to be confined at WVRJ for financial gain; (b) allowed inmates with COVID-19 to mingle with other inmates; (c) failed to provide

proper masks or cleaning supplies to inmates; and (d) delayed or denied Anders's written grievances about COVID-19; and (2) the medical defendants violated Anders's rights when they allegedly (a) "falsified COVID-19 test results and or documents relating to the test results of inmates" and treated medical requests related to COVID-19 as "routine"; (b) denied prompt and appropriate treatment for Anders's complaints about COVID-19-like symptoms; and (c) delayed or denied his written grievances about COVID-19. *Id.* at 8, 9. As relief, Anders seeks declaratory and monetary relief.[3]

The nonmedical defendants and the medical defendants, by counsel, have filed separate motions to dismiss. The medical defendants also attach an affidavit and medical records to their motion. Anders has responded to both motions, making them ripe for decision.

---

[3] Anders also sought injunctive relief ordering that he be transferred away from WVRJ. On February 11, 2021, only a month after Anders filed his § 1983 action, he notified the court that he had been transferred to a state prison facility. Because he is no longer housed under the conditions of which he complains in this action, his demands for injunctive relief are moot. *Rendelman v. Rouse*, 569 F.3d 182, 186 (4th Cir. 2009) ("[A]s a general rule, a prisoner's transfer or release from a particular prison moots his claims for injunctive and declaratory relief with respect to his incarceration there.").

## II.   DISCUSSION.

### A.  Standards of Review.

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of a complaint to determine whether the plaintiff has properly stated a claim; "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).[4] The court's inquiry must focus only on whether the allegations constitute "a short and plain statement of the claim showing that the pleader is entitled to relief."  In considering a Rule 12(b)(6) motion, a court must accept all factual allegations in the complaint as true. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

To state an actionable claim, the plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level," to one that is "plausible on its face," rather than merely "conceivable." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.  Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal

---

[4]  I have omitted citations, internal alterations, and/or quotation marks here and throughout this Opinion and Order, unless otherwise noted.

conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.*

## B.  Deliberate Indifference Claims.

To state a claim under § 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).  The Eighth Amendment protects prisoners from cruel and unusual living conditions.  *Rhodes v. Chapman*, 452 U.S. 337 (1981). To state a claim of constitutional significance regarding prison conditions or denial of medical care, a plaintiff must allege facts demonstrating that (1) the challenged conditions resulted in a deprivation of a basic human need that was objectively "sufficiently serious" and (2) that, subjectively, each defendant prison official acted with a sufficiently "culpable state of mind" with regard to the conditions.  *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).  To satisfy this subjective element, a plaintiff must show that the defendant official acted with deliberate indifference toward the risk of harm — that the official was aware of facts from which he could draw an inference that a substantial risk of harm existed and that he actually drew that inference. *Farmer v. Brennan*, 511 U.S. 825, 835-37 (1994).  Then, the plaintiff must show that the official disregarded the risk by failing to take "reasonable measures" to alleviate the risk.  *Id.* at 832.

### 1. *Plaintiff May Not Litigate Others' Rights.*

Anders asserts general challenges to the defendants' alleged failures to protect inmates at WVRJ from contracting COVID-19.  However, Anders, as a plaintiff proceeding pro se, is not authorized to litigate the interests of WVRJ inmates other than himself.  *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166 (1972) (a litigant "has standing to seek redress for injuries done to him, but may not seek redress for injuries done to others").  Thus, Anders as a pro se litigant may move forward only with those claims in which he alleges facts showing that the defendants' actions violated his own constitutional rights.  *Inmates v. Owens*, 561 F.2d 560, 562–63 (4th Cir. 1977) (holding that a plaintiff must allege facts demonstrating that he himself has sustained, or will sustained, deprivation of right, privilege or immunity secured by the constitution or federal law).  Accordingly, as to all of Anders's claims asserting that WVRJ's operational practices in 2020 caused or put at risk other inmates to contract COVID-19, I must grant the Motion to Dismiss, because Anders cannot litigate such claims.

### 2. *No Personal Involvement by Defendants.*

Anders also fails to state facts concerning how each defendant, individually, violated Anders's rights.  In a § 1983 case, "liability will only lie where it is affirmatively shown that the official charged acted personally in the deprivation of

the plaintiffs' rights.  The doctrine of respondeat superior . . . has no application under this section."  *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977).

Anders argues that Superintendent Russell should be vicariously liable for the mistakes that WVRJ employees allegedly made in addressing the risks and results of COVID-19 in the facility.  He alleges that Dr. MacDonald, in some unspecified medical leadership role, should be liable for any delay or shortcoming in the medical care provided to inmates at WVRJ.  To establish a viable claim of supervisory liability under § 1983, however, the plaintiff must establish that

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).  Nowhere in the Complaint does Anders provide factual support for a viable supervisory liability claim against Superintendent Russell or Dr. MacDonald.

Similarly, Anders fails to state facts concerning how each of the individual named jail officials or medical officials interacted with him in a manner that deprived him of constitutionally protected rights.  Simply stated, Anders has not alleged facts about each individual defendant's actions or inactions that violated his constitutional

rights. *Iqbal*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). Thus, I will grant the Motions to Dismiss as to all individual defendants.[5] In any event, Anders fails to state facts showing deliberate indifference by anyone.

### 3. *No Deliberate Indifference to Hazardous Conditions.*

To satisfy the objective element of a claim about past conditions, the plaintiff must show that he has sustained a serious or significant mental or physical injury as a result of the challenged conditions. *Strickler v. Waters*, 989 F.2d 1375, 1380-1381 (4th Cir. 1993). To satisfy the subjective element of a conditions claim, plaintiff must show that the defendant officials acted with deliberate indifference toward the risk of harm — that the official was aware of facts from which he could draw an inference that a substantial risk of harm existed and that he actually drew that inference. *Farmer,* 511 U.S. at 835-37. Then, plaintiff must show that the official disregarded the risk by failing to take "reasonable measures" to alleviate the risk. *Id.* at 832. "An official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment." *Id.* at 838. In addition, an official's merely

---

[5] I will address separately Anders's claims against Wellpath.

negligent action or inaction is not sufficient to give rise to a constitutional claim and, accordingly, is not actionable under § 1983. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998) ("[T]he Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold" of constitutional protections).

Anders alleges suffering harm from being exposed to COVID-19 in some unspecified way at WVRJ. He tested positive for the virus, and he alleges suffering uncomfortable symptoms that made it difficult to leave his bed for a few days. On these allegations, I will assume for purposes of this Opinion that he has met the objective aspect of the Eighth Amendment standard. He fails to state facts, however, showing the required deliberate indifference — that the defendants knowingly exposed him to serious risks of contracting COVID-19 at the jail. On the contrary, Anders's own allegations about COVID-19 measures at WVRJ refute any claim of deliberate indifference. *See Baxley v. Jividen*, No. 3:18-1526, 2020 WL 1802935, at *6 (S.D. W. Va. Apr. 8, 2020) (denying preliminary injunction upon finding that plaintiffs likely could not show deliberate indifference where defendants' actions showed that they had a plan in place to try to limit transmission of COVID-19). I agree with the *Baxley* court's explanation for its finding: "Mitigation is all that can be demanded in this case, as no technology yet exists that can cure or entirely prevent

COVID-19. The best scientists in the world have been unable to eliminate the risk of the disease, and the Court can expect no more of Defendants." *Id.* at *7.

Anders first complains that the defendants allowed Franklin County Jail inmates to be moved to and confined at WVRJ, although many of these inmates tested positive for COVID-19. He suggests, with no factual support, that this decision was based on the defendants' desire for extra money from space rental. I need not accept such an ungrounded generalization as true in evaluating Anders's claims. *Iqbal*, 556 U.S. at 678.

Moreover, Anders alleges facts showing that WVRJ staff had detailed procedures in place to avoid confining inmates known to have COVID-19 with other inmates. They housed the Franklin County COVID-19-positive inmates in an area of the facility separate from other inmates. They tested inmates who complained of possible COVID-19 symptoms and created quarantine units for such inmates. Staff members who moved inmates between housing units wore personal protective equipment that minimized the chance for staff to spread the virus from one group of inmates to another.

Anders complains that WVRJ staff members could have done more to protect inmates from contracting COVID-19. He claims that they allowed inmates from different units to have physical contact with each other on occasion and that they did not provide extra cleaning, sanitation supplies, or personal protective equipment to

inmates.[6]   However, Anders has failed to state facts suggesting that any specific policy, action, or inaction by any of the defendants caused him to contract COVID-19.   He does not describe any situation where officials knowingly placed him in close contact with any of the Franklin County inmates or with any inmate known to have COVID-19 symptoms or to have tested positive for the virus.   Furthermore, Anders does not state facts to show that any defendant — or anyone at WVRJ — knew of a specific risk to him, other than the general risks of COVID-19 that were already being addressed through testing and quarantining.   He does not allege that he was particularly vulnerable to serious complications from the virus, or that he suffered any such complications.

In short, jail administrators and officials are required to take reasonable measures to prevent inmates' contraction of serious diseases, but the mere fact that Anders became infected with COVID-19 while at WVRJ does not support an Eighth Amendment claim.   *Tillery v. Va. Peninsula Reg'l Jail,* No. 1:20cv751 (RDA/TCB), 2020 WL 6742991, at *5 (E.D. Va. Nov. 17, 2020) ("Plaintiff has not established

---

[6]  Anders also asserts that the defendants did not have COVID-19-negative inmates with possible COVID-19 symptoms retested for the virus as soon as he believed they should have done.  Generally, nonmedical jail staff or officials can rightfully rely on the trained medical staff to make decisions about inmates' medical needs or conditions, or the appropriate course of treatment.  *Miltier v. Beorn*, 896 F.2d 848, 854 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837.  Thus, I cannot find that Anders has stated a deliberate indifference claim against the nonmedical defendants based on the timing of any COVID-19 tests.

deliberate indifference . . . simply because another inmate, who had been released from a COVID-19 quarantine, was assigned as his cellmate. Every person in the United States, whether in a detention facility or not, faces COVID-19 exposure."). Therefore, I will grant the nonmedical defendants' Motion to Dismiss, ECF No. 27, as to the Eighth Amendment conditions claims.

### 4.  *Claims of Deliberate Indifference to Serious Medical Needs.*

Anders cannot prevail on his first two deliberate indifference claims against the two medical defendants, Wellpath or Dr. MacDonald, because he is attempting to vindicate the rights of WVRJ inmates as a group.  *Owens*, 561 F.2d at 562–63. Thus, Anders's assertions that the medical defendants falsified reports of testing or test results as to some other inmates, or improperly classified other inmates' COVID-19-related requests for medical care as routine, must be dismissed here. *Iqbal*, 556 U.S. at 678.   Because Anders fails to state facts concerning Dr. MacDonald's personal involvement in any denial of care to Anders or any deprivation of his constitutional rights, I will also grant his Motion to Dismiss.  The one remaining defendant is Wellpath.

"A prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  An inmate alleging a deliberate indifference claim related to

medical care must establish that his medical condition was objectively serious — that is, "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). The inmate must also show that the official subjectively knew of and disregarded an excessive risk to the inmate's health or safety. *Jackson*, 775 F.3d at 178 (citing *Farmer*, 511 U.S. 825, 837 (1994)). It is not sufficient to show that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk of harm posed by his own action or inaction. *Id.*

A private entity operating under color of state law, such as a prison health care services company, is subject to suit under 42 U.S.C. § 1983 when execution of a company policy or custom causes the alleged deprivation of the plaintiff's constitutional rights. *Wesley v. Charlotte-Mecklenburg Cnty. Police Dep't*, No. 3:19-CV-00425-FDW-DCK, 2021 WL 1971499, at *7 (W.D.N.C. May 17, 2021). Outside of formal written regulations or formal rulings by policy makers, a custom may arise if a practice is so "persistent and widespread" and "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Id.*

Anders alleges that Wellpath had a custom of treating all WVRJ inmate medical requests related to COVID-19 as routine, including his own. While his

allegations do not provide many dates, his attached medical requests indicate that after complaining, verbally and in writing, of COVID-19-like symptoms including shortness of breath, he waited several days to be retested for the virus.  Until he received a COVID-19-positive test result, he allegedly received only pain medication.  Anders has also submitted affidavits from other WVRJ negative-tested inmates who claim that their complaints of similar symptoms did not trigger prompt medical attention.  Taking this evidence as true at this stage of the case, I decline to grant dismissal under Rule 12(b)(6) to Wellpath on the claim that requests for treatment of COVID-19 complaints were treated as routine.

In support of its Motion to Dismiss, Wellpath has submitted an affidavit from Rachel L. Travitz, the Health Services Administrator at WVRJ and an employee of Wellpath who is familiar with records charting the course of care Anders received at the facility, which she attaches to the affidavit.  Br. Supp. Ex. 1, Travitz Aff., ECF No. 34-1.  In ruling on Wellpath's motion, I will rely on this information and consider Anders's claims against this defendant under the summary judgment standard in Rule 56.[7]  Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or

---

[7]  A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could

12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.").  Both the medical defendants and the court filed Notices informing Anders that he was entitled to respond to the motion and its evidence and that failure to do so adequately might result in judgment being entered against him.[8]

Anders has not disputed the accuracy of Travitz's description of his course of medical care at WVRJA or the attached records.  On November 11, 2020, Anders first told jail staff that he "felt sick" and needed to be seen by a nurse; an officer told him to sign up for sick call.  Compl. 4, ECF No. 1.  On November 12, 2020, medical staff tested Anders and the other inmates from 4B Housing Unit for COVID-19.  Test

---

return a verdict for the nonmoving party." *Id.*  I must draw all reasonable inferences from the facts in favor of Anders, the nonmoving party. *Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004).  However, Anders cannot defeat the defendants' properly supported summary judgment motion with mere groundless generalizations or speculation. *Glover v. Oppleman*, 178 F. Supp. 2d 622, 631 (W.D. Va. 2001).

[8]  The defendants' Notice, ECF No. 35, advised that Anders, as the pro se plaintiff "must identify all facts stated by the moving party with which [he] disagrees and must set forth [his] version of the facts by offering affidavits (written statements signed before a notary public and under oath) or by filing sworn statements (bearing a certificate that it is signed under penalty of perjury)."  The court's Notice, ECF No. 38, stated that Anders had twenty-one days to respond to the motion and that "if documents or affidavits outside the pleadings [were] submitted by either party, any remaining motion(s) to dismiss under Rule 12(b)(6) . . . [might] be considered as motion(s) for summary judgment under Rule 56."

results received on November 13, 2020, showed that Anders was negative for the virus.  Staff then housed Anders with inmates who had also tested negative.

On November 14, 2020, Anders submitted a Healthcare Request reporting, "I feel REAL bad.  I want to be tested for COVID again."  Travitz Aff. at ¶ 4, ECF No. 34-1.  That same day, a nurse assessed Anders, took his vital signs, and provided him with Tylenol in addition to the Ibuprofen proscribed to him a few days earlier for pain from a wrist condition.

On November 16, 2020, Anders filed a Healthcare Request form reporting that he wanted to see a doctor, he felt "terrible," he had "all the symptoms of COVID," his prior test must have been a "false negative," and he was being denied the "right to be tested."  *Id.* at ¶ 5.  Later on November 16, 2020, Anders filed a second Healthcare Request form complaining that his body, head, and throat hurt and that he was coughing, short of breath, and could not taste or smell.  On November 17, 2020, medical staff retested Anders for COVID-19.  On November 18, 2020, the test results showed that Anders was now positive for COVID-19.  Staff moved him to a housing area with other positive-testing inmates.

Between November 17 and December 1, 2020, a member of the medical staff saw Anders nearly every day and sometimes twice a day to assess his condition and take his vital signs.  On November 19, 2020, a nurse practitioner examined Anders, who reported that he was not feeling well, had mild shortness of breath and cough.

Staff checked his vital signs, his oxygen levels, and his lungs. Based on these assessments, the nurse practitioner ordered albuterol nebulizer treatments, Vitamin D3, Zinc, and oral steroids. Later on November 19, 2020, Anders refused an offered vital signs check. On November 20, 2020, Anders reported having a sore throat. A nurse assessed him, took his vital signs, and had access to his records showing the medications already prescribed.

Anders did not report any symptoms between November 20 and November 23, 2020. On November 24, 2020, Anders submitted a Healthcare Request form complaining that his medications had stopped. He reported that he still felt sick and asked for reinstatement of the medications. In response, staff reordered the medications.

Between November 17, 2020, and December 1, 2020, Anders refused staff's offer of checks for COVID-19 symptoms and vital signs twenty-one times. Other than the requests described above, Anders did not report additional COVID-19 symptoms during this period. Travitz states that Wellpath does "not have a blanket policy of treating COVID-19 complaints as 'routine.' As is recognized globally, COVID-19 symptoms and signs vary widely in degree and type. We respond to each patient's complaint appropriately, in context and in accordance with the type and degree of complaint." *Id.* at ¶ 12.

On the undisputed medical record before me, I cannot find that Anders has put forth any genuine issue of material disputed fact on which he could persuade a fact finder to rule in his favor against Wellpath. At the most, Anders complains that he did not receive specific treatment for COVID-19-like respiratory symptoms as quickly as he believed appropriate. It is well established that such disagreements with a medical professional's judgment about the type or timing of treatment cannot support a finding of deliberate indifference. *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) ("a prisoner does not enjoy a constitutional right to the treatment of his . . . choice" so long as the medical treatment provided is adequate). Moreover, the record indicates that Wellpath staff provided Anders with assessment of and care for the COVID-19 symptoms of which he complained and that those symptoms resolved within a two-week period. Even if I were to assume that Anders's symptoms presented a serious medical need for treatment, I cannot find any disputed fact showing that a Wellpath policy or custom caused his symptoms or caused any prolonging or aggravation of those symptoms. Therefore, I will grant summary judgment for Wellpath on Anders's claim that it had a policy of treating COVID-19 complaints as routine that caused him harm.

### B. Grievance Procedure Problems.

Finally, Anders complains that both sets of defendants violated his constitutional rights by failing to respond promptly to his written grievances —

about conditions he considered hazardous and about his belief that he needed immediate retesting and treatment for COVID-19. "[I]nmates have no constitutional entitlement or due process interest in access to a grievance procedure. An inmate thus cannot bring a § 1983 claim alleging denial of a specific grievance process." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 541 (4th Cir. 2017). Thus, failing to respond to a complaint, delaying a grievance response, or denying a grievance altogether, without more, did not deprive Anders of any constitutionally protected right. *Id.* For these reasons, I will grant the Motions to Dismiss as to Anders's claims concerning the type or timing of the responses to his complaints and grievances.

## III. CONCLUSION.

For the reasons stated, it is hereby **ORDERED** as follows:

1.    Anders's request for interlocutory injunctive relief included in his Complaint is DENIED as moot, based on his transfer to another jail facility;

2.    The Motion to Dismiss filed by the nonmedical defendants, ECF No. 27, is GRANTED; and

3.    The Motion to Dismiss filed by defendants Wellpath and Dr. MacDonald, ECF No. 33, is GRANTED.

A separate Judgment will enter herewith.

ENTER:   March 10, 2022

/s/  JAMES P. JONES
Senior United States District Judge